UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO: 21-179** |
| **GLENN E. DIAZ** | **SECTION "H"** |

### ORDER AND REASONS

Before the Court is Defendant Glenn Diaz's Motion for a Judgment of Acquittal and, Alternatively, New Trial (Doc. 195). Oral argument was held on July 19, 2023. For the following reasons, the Motion is **DENIED**.

### BACKGROUND

In November 2022, Defendants Glenn Diaz, Peter Jenevein, and Mark Grelle were charged in a 31-count Superseding Indictment with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344(2) and 1349; conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h); and bank fraud in violation of 18 U.S.C. § 1344(2).[1] After a seven-day jury trial, Defendant Diaz was found guilty on both counts of conspiracy and eight counts of bank fraud. The Court declared a mistrial as to the remaining

---

[1] *See* Doc. 98. Diaz and Jenevein were charged in each of the 31 counts of the Superseding Indictment, and Grelle was charged in 20 of the counts. Count 1 charged all three Defendants with conspiracy to commit bank fraud. Count 2 charged all three Defendants with conspiring to commit money laundering. In Counts 3 through 31, Diaz and Jenevein were charged with bank fraud, and Grelle was also charged in Counts 3 to 6, 11, 14, 15, 18 to 25, and 28 to 30.

1

21 counts of bank fraud.[2] Defendant Diaz now moves for (1) acquittal on all counts, arguing that the Government failed to prove all of the elements of the charges, and alternatively, (2) a new trial on all charges in light of errors he argues were made by this Court during trial.

The evidence presented at trial revealed the following. Glenn Diaz was a customer of First NBC Bank ("FNBC" or "the Bank"), a federally insured financial institution, from approximately 2006 until its closure in 2017. Pete Jenevein was personal friend and employee of Diaz. Mark Grelle was also a friend of Diaz and owned St. Bernard Underground Services, a business that performed directional boring services.

Despite being asset-rich, Diaz claimed to be cash-poor, and managed many of his personal and business expenditures by overdrafting his FNBC checking account. By 2015, Diaz had overdrafted his account by almost one million dollars; these overdrafts were approved by FNBC president Ashton Ryan. Because Diaz's overdrafts were often checks issued to himself, which were then deposited into his Trustmark Bank account, FNBC had no visibility into the sources of the expenses. As a result, by June 2016, Ashton Ryan and Loan Officer Bill Bennet informed Diaz that, in order to monitor how Diaz was spending its funds, all checks were required to be supported by itemized expenses for a Florida warehouse, Diaz's property that served as the Bank's

---

[2] Defendant Jenevein was found guilty on all 31 counts. Defendant Grelle was found guilty on all counts except Count 3 for which he was found not guilty.

collateral.[3] FNBC also required Diaz to issue all checks to the end recipient, and not to Diaz himself.[4]

Because Jenevein was responsible for managing Diaz's properties, including the Florida warehouse, through the rest of 2016, Jenevein emailed invoices and lists of expenses to Bennett, copying Diaz.[5] Based on these representations, the Bank permitted Diaz to overdraft his account, which Bennett explained was tantamount to an unsecured loan.[6] Loans were subsequently made by the Bank to cover the overdrafts "created by repairs to [Diaz's] warehouse in Lynn Haven, FL."[7] At trial, the evidence revealed that Diaz did not actually spend the Bank's money on his Florida warehouse, as he represented. Rather, Diaz was able to obtain these funds through a scheme that involved submitting fabricated invoices and financial documents to the Bank with the help of Jenevein and Grelle.

The scheme essentially involved two parts. First, Jenevein and Grelle fabricated invoices that falsely represented that Grelle Underground Services LLC, a company owned by Grelle, performed services at Diaz's Florida warehouse. Jenevein then emailed the fake invoices to Bennet, copying Diaz. Based on these invoices, the Bank distributed the funds to Grelle, who

---

[3] On June 7, 2016, Bennett instructed Diaz and Jenevein that "there are no other funds available for further checks," and asked them to "[p]lease stop writing checks on the First NBC account." Government Ex. 25. Bennett also explained that "[i]n order to move forward, I need more information from you," and delineated the requirements that had to be satisfied before the Bank would fund future overdrafts and loans, including a "detailed breakdown of expenses you project in order to make the Florida property ready for the new tenant." *Id*. On June 13, 2016, Bennett emailed Diaz, writing "I told you the bank could only consider paying checks if we had invoices to support them. We had $28k in invoices, and Ashton covered $28k in checks. I continued telling you we needed invoices to pay checks." Government Ex. 36.

[4] On June 13, 2016, Ashton Ryan emailed Diaz, stating "The checks have to be to the end recipient. No more checks to yourself." *Id*. The following day, Diaz forwarded Ryan's email to Jenevein, instructing him to "[n]ever write a check to my name any more[.] Only to the end user or recipient." *Id*.

[5] *See* Government Exs. 22, 23.

[6] *See* Government Ex. 24.

[7] Government Ex. 78. *See also* Government Exs. 1001–05.

ultimately funneled the money back to Diaz while keeping a portion for himself. These circular transactions occurred a total of 17 times and formed the basis for 17 counts of bank fraud, as well as conspiracy to commit bank fraud and conspiracy to commit money laundering.

The second part of the scheme also involved submitting false information to the Bank. Instead of circular transactions conducted with Grelle Underground Services, Jenevein sent the Bank fake invoices from other companies, payroll for purported Diaz employees, and bogus credit card itemizations. Based on these representations, the Bank distributed the funds. The costs reflected in these documents, however, were inflated, not incurred, or for other expenses unrelated to maintaining Diaz's Florida warehouse.

## **LEGAL STANDARD**

### **A. Motion for Acquittal**

Under Rule 29 of the Federal Rules of Criminal Procedure, a defendant may move for a "judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[8] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[9] To this end, the court must "review the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict."[10] The court is "concerned only with whether the jury made a

---

[8] FED. R. CRIM. P. 29.
[9] Jackson v. Virginia, 443 U.S. 307, 319 (1979).
[10] United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir. 2008) (internal quotations omitted).

rational decision, not whether its verdict was correct on the issue of guilt or innocence."[11]

## B. Motion for New Trial

Federal Rule of Criminal Procedure 33(a) states, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[12] The Fifth Circuit has held "the trial court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict. A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant."[13] The movant bears the burden of demonstrating that a new trial is justified.[14]

## LAW & ANALYSIS

Defendant Diaz moves for (1) a judgment of acquittal on all counts, arguing that the Government failed to prove all of the elements of the charges, and alternatively, (2) a new trial on all charges in light of errors he argues were made by this Court during trial. The Court will address each request in turn.

### A. Acquittal

#### 1. Bank Fraud

Count 1 of the Superseding Indictment charged Defendants with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344(2) and 1349. Counts 3 through 31 charged Defendants with bank fraud in violation of 18 U.S.C. § 1344(2). As to bank fraud conspiracy, the Government was required to prove beyond a reasonable doubt that: (1) "the defendant and at least one

---

[11] *Id.* (internal quotations omitted).
[12] FED. R. CRIM. P. 33.
[13] United States v. Wall, 389 F.3d 457, 466 (5th Cir. 2004).
[14] United States v. Soto-Silva, 129 F.3d 340, 343 (5th Cir. 1997).

other person agreed to commit the crime of [bank fraud]"; and (2) "the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose."[15] To secure a conviction on bank fraud, the Government was required to prove beyond a reasonable doubt that: (1) "the defendant knowingly executed a scheme or artifice"; (2) "the scheme or artifice was executed to obtain money or other property from a financial institution"; (3) "the scheme or artifice was executed by means of false or fraudulent pretenses, representations, or promises"; and (4) "the false or fraudulent pretenses, representations, or promises were material."[16]

The jury found Diaz guilty of conspiracy to commit bank fraud and eight counts of bank fraud, and its conviction is adequately supported by the record. At trial, the Government presented evidence that the Defendants acted in concert to submit fabricated invoices and credit card itemizations to FNBC to satisfy the Bank's demands for documentation of Diaz's expenditures. Based on these misrepresentations, the Bank authorized Diaz to write checks that overdrew his account. These checks were either deposited into Diaz's Trustmark account, or they were issued to Grelle, who deposited them into his Regions account before returning the checks to Diaz to be deposited in Diaz's Chase account. As shown at trial, the funds, totaling over $550,000, were not used for Diaz's Florida warehouse, as represented. Instead, these funds covered Diaz's personal expenditures and payments to Grelle and Jenevein. Based on these concerted actions among the Defendants, the jury rationally concluded that they committed bank fraud and conspired to commit bank

---

[15] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019). *See also* United States v. Pascacio-Rodriguez, 749 F.3d 353, 363-64 (5th Cir. 2014) (stating that, unlike conspiracy under 18 U.S.C. § 371, fraud conspiracy under § 1349 does not require an overt act).
[16] Pattern Crim. Jury Instr. 5th Cir. 2.58B (2019).

fraud. Nevertheless, Diaz maintains that it was irrational for the jury to find that he made material misrepresentations to FNBC or knowingly committed bank fraud.

Diaz first argues that the Government failed to prove the fourth element of bank fraud—that any false representations were material. According to Diaz, FNBC banker Bill Bennett testified that he lacked the authority to approve or deny Diaz's loan requests and that this authority rested solely with former FNBC president Ashton Ryan, who did not testify at trial. Without Ryan's testimony, Diaz argues that the Government failed to prove whether FNBC relied on any of his representations. The Court disagrees. Diaz's argument misapprehends the standard of materiality. "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."[17] "This definition, in referring to natural tendencies and capabilities, establishes materiality in the bank fraud context as an objective quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision."[18] As a result, "there is no requirement that the misrepresentations must have actually influenced the decision-maker or that the decision-maker in fact relied on the misrepresentations."[19] Thus, the Government was not required to prove that FNBC actually relied on Defendants' representations.

Even so, former FNBC employees Bill Bennett and Robert Stone testified that the Bank was especially attentive to how Diaz was spending its proceeds

---

[17] Neder v. United States, 527 U.S. 1, 16 (1999) (quotation and alteration omitted).
[18] United States v. Irvin, 682 F.3d 1254, 1267 (10th Cir. 2012). *See also* United States v. Wolf, 860 F.3d 175, 193 (4th Cir. 2017) (explaining that "the test for whether a false statement to a bank is material is an objective one; it does not change from bank to bank").
[19] United States v. O'Brien, 953 F.3d 449, 460 (7th Cir. 2020). *See also* United States v. Gregg, 179 F.3d 1312, 1315 (11th Cir. 1999) (stating that "reliance is not necessary to make the false statement material").

7

in 2016. For instance, a June 2016 email from Bennett to Diaz and Jenevein instructed that additional checks could only be written for Florida warehouse repairs and that the bank would require "[a] detailed breakdown of expenses you project in order to make the Florida property ready for the new tenant."[20] Accordingly, it cannot be said that no rational jury would have found that Defendants' misrepresentations tended to influence or were capable of influencing FNBC.

Diaz further argues that any misrepresentations could not have been material because his loan documents never limited his use of funds to the Florida warehouse, the bank knew he was "living off his FNBC loans," and the bank was engaged in a "charade" and "did not care" how its funds were spent.[21] The Court finds this argument unavailing. Even assuming the veracity of these assertions, none of this forecloses the jury from rationally concluding that Defendants' misrepresentations were material. Indeed, "'if a defendant knowingly provided materially false information in order to induce the loan, the crime is complete.'"[22] "Therefore, even if the decision maker did not rely on the fraudulent information, it is still a violation of § 1344(2) to submit false information."[23]

Next, Diaz argues that the Government failed to prove that he knowingly executed a "scheme to defraud." In *Shaw v. United States*, the Supreme Court explained that a "scheme to defraud" must be intended "to deceive the bank

---

[20] Government Ex. 25.
[21] Doc. 195-1 at 10, 13–14.
[22] United States v. Sapp, 53 F.3d 1100, 1103 (10th Cir. 1995) (quoting United States v. Hollis, 971 F.2d 1441, 1452 (10th Cir. 1992)).
[23] United States v. Miller, 2009 WL 10676353, at *8 (D. Kan. Oct. 15, 2009) (first citing *Sapp*, 53 F.3d at 1103 (finding a violation even though the forged documents submitted to the bank were not necessary to obtain the funds), and then citing United States v. Akers, 215 F.3d 1089, 1101 (10th Cir. 2000)).

and deprive it of something of value."[24] Diaz maintains that insufficient evidence exists to prove he had specific intent to deceive the bank and deprive it of property. Instead, he avers that the evidence supports the opposite—that he intended to repay the bank and ultimately settled his debt with FNBC's successor. The Court disagrees. First, a defendant's intent to repay fraudulently obtained funds is irrelevant.[25] Second, even if Diaz intended to repay his loans, he still could have intended to deprive the bank temporarily.[26] As the Supreme Court held in *Shaw*, "it is sufficient that the victim (here, the bank) be 'deprived of its right' to use the property, even if it ultimately did not suffer unreimbursed loss."[27] Thus, neither Diaz's intent to repay his debt nor the ultimate settlement of his debt prevent the jury from rationally finding that Diaz intended "to deceive the bank and deprive it of something of value."[28]

Finally, Diaz contends that the Government presented no evidence establishing his knowledge of Jenevein and Jenevein's daughter creating false invoices. The Court finds this argument unpersuasive. As the Government

---

[24] Shaw v. United States, 580 U.S. 63, 72 (2016).
[25] *See* United States v. Miller, 953 F.3d 1095, 1103 (9th Cir. 2020) ("Miller's primary defense—that he was not guilty of wire fraud because he intended to pay back the funds he deceptively obtained from [the victim company]—is not a defense at all."); United States v. Masquelier, 210 F.3d 756, (7th Cir. 2000) ("[The defendant's] ultimate intention to make good on the contract is irrelevant to his intent to obtain government money to which he was not entitled through deceptive means. . . . [T]o hold otherwise would require us to overturn a thousand years of criminal law.").
[26] *See* United States v. Sater, 2021 WL 744159, at *12 (M.D. Penn. Feb. 25, 2021) ("Defendant again ignores the fact that the ultimate outcome of the scheme is not at issue . . . and a scheme to even temporarily obtain [the bank]'s property . . . can be sufficient to establish a scheme for purposes of § 1344.") (internal citations omitted); United States v. Daniel, 329 F.3d 480, 487 (6th Cir. 2003) ("The government showed that Daniel also had the requisite intent to defraud by presenting sufficient evidence that Daniel intended to deprive [the victim company] of money, even if only in the short-term."); United States v. Rossomando, 144 F.3d 197, 201 n.4 (2d Cir. 1998) ("It is also irrelevant whether such a defendant does in fact pay back the loan, or more generally, whether the victim of a fraudulent scheme does in fact suffer harm, so long as concrete harm was contemplated.").
[27] *Shaw*, 580 U.S. at 67–68 (quoting Carpenter v. United States, 484 U.S. 19, 26–27 (1987)).
[28] *Id*. at 72.

correctly notes, "the jury reasonably concluded that Diaz was aware that invoices were being submitted by Jenevein because Jenevein copied him on emails to Bennett."[29] Further, Diaz deposited all 17 checks from Grelle into his Chase account, totaling more than $330,000 over a six-month period of time. Accordingly, it cannot be said that no rational jury would have inferred Diaz's knowledge of the fraud. Diaz's request for acquittal on these counts is denied.

### 2. Money Laundering Conspiracy

Count 2 charged Defendants with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h). Here, the government was required to prove beyond a reasonable doubt: "(i) 'that there was an agreement between two or more persons to commit money laundering'; and (ii) 'that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose.'"[30] The object of the conspiracy charged in this case was concealment money laundering,[31] which required the Government to prove that: (1) "the defendant knowingly conducted [or] attempted to conduct a financial transaction" involving "the proceeds of a specified unlawful activity, namely [bank fraud]"; (2) "the defendant knew that the property involved in the financial transaction represented the proceeds of" bank fraud; and (3) "the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity."[32]

Diaz argues that he should be acquitted of conspiracy to commit money laundering for two reasons. First, he argues that the Government failed to

---

[29] Doc. 196-2 at 17 (citing Government Exhibits 97, 117).
[30] United States v. Alaniz, 726 F.3d 586, 601 (5th Cir. 2013) (quoting United States v. Fuchs, 467 F.3d 889, 906 (5th Cir. 2006)).
[31] *See* 18 U.S.C. § 1956(a)(1)(B)(i).
[32] Pattern Crim. Jury Instr. 5th Cir. 2.76A (2019). Bank fraud is a specified unlawful activity. *See* 18 U.S.C. § 1956(c)(7) (referencing 18 U.S.C. § 1961(1)); 18 U.S.C. § 1961(1) (listing 18 U.S.C. § 1344 as an enumerated offense)).

prove the materiality and knowledge elements of bank fraud. Consequently, he contends that the Government failed to prove an essential element of a money laundering conspiracy, i.e., the existence of proceeds of an unlawful specified activity. This argument is unavailing, as the Court has previously determined that the Government presented sufficient evidence for a rational jury to convict Diaz of bank fraud.

Second, Diaz maintains that the Government failed to prove that he entered into any conspiratorial agreement or otherwise conducted any financial transactions designed to conceal bank fraud. Not so. At trial, the evidence revealed that by June 2016, FNBC required all checks to be justified by invoices for the Florida warehouse and to be written to the end recipient.[33] The evidence further established that each Defendant had a unique role in conducting circular financial transactions to avoid scrutiny by the Bank. Jenevein submitted false invoices to FNBC for services purportedly, though not actually, performed by "Grelle Underground Services." Based on these falsities, the Bank permitted Diaz to write checks to Grelle, who then deposited them in his Regions bank account. The evidence showed, however, that Grelle ultimately returned the funds to Diaz to be deposited in Diaz's Chase bank account.

On July 27, 2016, for example, Jenevein emailed Grelle with the subject line "Invoice ceiling tiles an[d] insulation," giving him the date (July 12, 2016), amount ("Total $18,933.00"), and contents (such as "30 Rolls of hanging wire"

---

[33] On June 13, 2016, Bill Bennett emailed Diaz, writing "I told you the bank could only consider paying checks if we had invoices to support them. We had $28k in invoices, and Ashton covered $28k in checks. I continued telling you we needed invoices to pay checks." Government Ex. 36. That same day, Ashton Ryan emailed Diaz, stating "The checks have to be to the end recipient. No more checks to yourself." *Id*. The following day, Diaz forwarded Ryan's email to Jenevein, instructing him to "[n]ever write a check to my name any more[.] Only to the end user or recipient." *Id*.

11

and "Payment upon delivery") for the invoice.[34] Jenevein subsequently emailed the completed "Grelle Services" invoice to Bennett, copying Diaz and writing, "This invoice was paid today with a first nbc check. This invoice is associated with The ceiling, insulation, tracts, wire etc for metal pro warehouse office."[35] Grelle then deposited a check written from Diaz's FNBC account for $18,933.00 on July 28, 2023.[36] On August 9, 2016, Grelle issued a check from his Regions account back to Diaz for $18,000, which Diaz then deposited into his personal Chase checking account.[37] These circular financial transactions occurred a total of 17 times.[38]

These circular transactions establish the requisite elements of a conspiracy to commit money laundering.[39] Based on the fact that Diaz was copied on the emails from Jenevein to Bennett containing fabricated financial documents, a rational jury could find that Diaz knew the subsequent return checks from Grelle were proceeds derived from "some form of unlawful activity."[40] The evidence also revealed that Diaz and Grelle opened bank accounts at other banks less than two months before the scheme began. A rational juror could infer that the conspirators opened the accounts to conceal their circular transaction scheme from FNBC by using bank accounts that FNBC could not monitor.[41] Grelle's addition of another step to the circular transactions further demonstrates an intent to conceal the source of the proceeds, which may be imputed to Diaz because "each member of the

---

[34] Government Ex. 494.
[35] Government Exs. 074, 074A.
[36] Government Exs. 076, 334.
[37] Government Exs. 333, 1023.
[38] *See* Government Ex. 1008.
[39] *See* 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h).
[40] 18 U.S.C. § 1956(a)(1)(B)i).
[41] *See* United States v. Chavez, 951 F.3d 349, 356 (6th Cir. 2020) (explaining that "a rational juror could infer that the conspirators opened the accounts to conceal their fraudulent-billing scheme from the chiropractors by using bank accounts the chiropractors could not monitor.").

conspiracy becomes the agent of every other member."[42] For the first three transactions, Grelle deposited FNBC's funds into the Grelle Underground Services account and then wrote a check back to Diaz. By the fourth transaction, however, Grelle added a step by moving the funds from the Grelle Underground Services account to his personal Regions account before sending the funds back to Diaz.[43] A rational jury could infer a concealment purpose from this conduct.

Although there was no direct evidence of an explicit agreement to launder money, a rational jury could infer the existence of a tacit understanding from the concerted actions of the Defendants.[44] The Government was not required "to prove that the alleged conspirators entered into any formal agreement, or that they directly stated between themselves all the details of the scheme."[45] Likewise, the Government was not required "to prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out."[46] Rather, such concert of action is sufficient to prove conspiracy to commit money laundering.[47] Diaz's motion for a judgment of acquittal on this count is also denied.

## B. Motion for New Trial

Diaz contends that this Court made various erroneous rulings regarding the admissibility of evidence and testimony, necessitating a new trial.

---

[42] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019). *See also* United States v. Delgado, 256 F.3d 264, 275–76 (5th Cir. 2001) (noting that the element can be proven even if the defendant has not personally handled the funds in question).
[43] *See* Government Ex. 1032.
[44] *See* United States v. Davis, 1998 WL 514156, at *3 (2d Cir. July 8, 1998) (citing United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997) (stating that a "conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement")).
[45] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019).
[46] *Id.*
[47] *See Davis*, 1998 WL 514156 at *3.

Specifically, Diaz argues: (1) that the Court erred in limiting the Defendants to a "reasonable person" standard instead of allowing the defense to argue that FNBC was a "bad bank" engaging in improper banking activity; (2) that the Court erred in excluding the majority of the testimony of Diaz's proffered banking expert, David Gibbons, regarding the Bank's negligent banking practices; and (3) that the Court erred in prohibiting Diaz from informing the jury that his loan had been paid. The Court will consider each argument in turn.

### 1. Materiality Defense & Banking Expert

As explained, the Government was required to prove that the Defendants made "material" fraudulent representations, i.e., representations that had "a natural tendency to influence, or [were] capable of influencing, the decision of the decisionmaking body to which it was addressed."[48] During opening statements, this Court sustained the Government's objection to Diaz's materiality defense. The Court explained that materiality is evaluated under an objective test and that the "naivety, carelessness, negligence, or stupidity of the institution" is not a permissible defense.[49] As a result, the Court instructed Defendants' counsel that they could not introduce argument as to how FNBC subjectively received Defendants' representations. Instead, the Court explained that the defense was limited to arguing whether Defendants' representations would have been material to a reasonable bank.

In conclusory fashion, Diaz argues that the Court erred in limiting his materiality defense because the "reasonable bank" standard did not apply in this case. Diaz contends that this error prejudiced his defense by precluding the jury from hearing that FNBC did not care how Diaz spent the Bank's funds

---

[48] Neder v. United States, 527 U.S. 1, 16 (1999) (quotation and alteration omitted).
[49] Pattern Crim. Jury Instr. 5th Cir. 1.40 (2019).

and "allowed Mr. Diaz's loans to continue because the bank wanted to continue to improperly pay itself interest from Diaz's loan funds, not because it was fooled or defrauded by Mr. Diaz."[50] According to Diaz, such argument should have been allowed because it was not "carelessness, negligence, or stupidity of the institution," but rather, it was "intentional behavior."[51]

Diaz again misapprehends the standard for materiality. The Fifth Circuit, along with several sister circuits, has held that a fraud victim's negligence is not a defense to criminal charges under the federal fraud statutes.[52] Likewise, "the intentional conduct of a lender cannot provide an effective defense based on alleged lack of materiality."[53] In *United States v. Lindsey*, the Ninth Circuit explained that materiality is evaluated under an objective standard that "is not concerned with a statement's subjective effect on the victim, but only 'the intrinsic capabilities of the false statement itself.'"[54] As a result, the court held that even "a victim's intentional disregard of relevant information is not a defense to wire fraud and thus evidence of such disregard is not admissible as a defense to mortgage fraud."[55] Similarly, here,

---

[50] Doc. 195-1 at 18.
[51] *Id.*
[52] *See* United States v. Kreimer, 609 F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence is not a defense to criminal conduct."). *See also* United States v. Lindsey, 850 F.3d 1009, 1015 (9th Cir. 2017) (holding that "a victim's negligence is not a defense to wire fraud" and "[e]vidence of lender negligence is thus not admissible as a defense to mortgage fraud."); United States v. Colton, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis: If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright." (internal quotation marks omitted)); United States v. Svete, 556 F.3d 1157, 1165 (11th Cir. 2009) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."); United States v. Allen, 201 F.3d 163, 167 (2d Cir. 2000) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for [the] substantive offense. . . ."); United States v. Coyle, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct.").
[53] *Lindsey*, 850 F.3d at 1015.
[54] *Id.*
[55] *Id.* at 1016.

whether FNBC officials actually "cared" about how Diaz spent its funds or intentionally disregarded Defendants' false statements has little relevance to whether those statements are intrinsically able to influence a decision.

For these same reasons, the Court excluded most of the testimony of Diaz's proffered banking expert, David Gibbons. The Court instructed Diaz that it would allow Gibbons to testify regarding banking principles and lending standards generally applied in the banking industry. The Court, however, precluded testimony regarding FNBC's negligent or improper banking practices. Specifically, Diaz sought to have Gibbons testify that the Bank was "profiting from the relationship," the Bank "did not enforce its lending agreements," the Bank "did not make any reasonable efforts to ascertain what the overdrafts" were used for, and other topics regarding the Bank's conduct during its relationship with Diaz.[56] According to Diaz, this testimony would have been offered in support of his argument that the Bank "did not care how he was using the money as long as the bank was able to continue paying itself interest from the loan proceeds."[57]

Again, these are not permissible defenses to materiality. As the Ninth Circuit clarified in *Lindsey*, "defendants may attack materiality through industry practice," but "the intentional conduct of the lender cannot provide an effective defense based on alleged lack of materiality."[58] The court explained:

> To illustrate, suppose a defendant is charged with wire fraud for falsely stating on a loan application that he was married. In such a case, it would be admissible for a defense expert to testify that, while mortgage applications usually ask about marital status, the general practice in the industry is to ignore marital status when making lending decisions. The defendant could then argue in closing that his false statement about marriage was immaterial, and so the elements of wire fraud have not been proven. By

---

[56] Doc. 195-1 at 19–22.
[57] *Id.* at 22.
[58] *Lindsey*, 850 F.3d at 1015–1016.

contrast, a district court could properly exclude evidence that (a) the particular lender to whom the defendant lied did not generally give weight to marital status when deciding whether to lend, or (b) there were prior instances in which that lender did not consider marital status in making loans.[59]

This is precisely what the Court did in excluding the majority of Gibbons' testimony. Accordingly, this Court does not find that it committed error in limiting Defendants' materiality defense and in excluding the testimony of Diaz's proffered banking expert.

### 2. Loan Resolution

Finally, Diaz maintains that he should be granted a new trial because the Court did not permit him to inform the jury that "his debt with FNBC had been settled and that he owed no money to the bank" after the Government suggested to the jury that the loan was forgiven.[60] The Court disagrees. As the Government correctly notes, the question was posed in response to cross-examination concerning tax implications for Diaz, and this single question did not cast "serious doubt on the correctness of the jury's verdict."[61] Moreover, the Court instructed the jury to disregard the Government's question, thus curing any prejudice.[62] Defendant Diaz's request for a new trial is denied.

### CONCLUSION

For the foregoing reasons, Defendant Glenn Diaz's Motion for a Judgment of Acquittal and, Alternatively, New Trial (Doc. 195) is **DENIED**.

---

[59] *Id.* at 1016.
[60] Doc. 195-1 at 22.
[61] Doc. 196-2 at 28 (quoting United States v. Guidry, 456 F.3d 493, 505 (5th Cir. 2006)).
[62] *See* United States v. Arledge, 524 F. App'x 83, 87 (5th Cir. 2013) (denying motion for new trial based on improper remark by prosecutor "[b]ecause the evidence of prejudice is minimal at best, because the district judge adequately informed the jury that lawyers' statements are not evidence, and because of the overwhelming evidence of [defendant's] guilt.").

New Orleans, Louisiana, this 31st day of August, 2023.

_____

**HON. JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**